IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VICTORIA SMITH | § | |
| | § | |
| *Plaintiff* | § | |
| | § | **Civil Action No.** 4:25-cv-5704 |
| vs. | § | |
| | § | |
| WHATABURGER RESTAURANTS | § | |
| LLC | § | |
| | § | |
| *Defendant* | § | |

## PLAINTIFF'S COMPLAINT

**COMES NOW** Plaintiff, VICTORIA SMITH, ("Plaintiff" or "Smith") who files this Complaint, respectfully showing unto the Court the following:

## INTRODUCTION

Plaintiff Victoria Smith (hereinafter "Smith" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1981 ("Section 1981") to remedy, *inter alia,* acts of racial discrimination and hostile work environment perpetrated against her by Defendant Whataburger Restaurants, LLC (hereinafter "Defendant" or "Whataburger") and/or its agents. Plaintiff contends that she was subjected to different terms and conditions of employment and a severe and pervasive hostile work environment by Defendant due to her race.

## Jurisdiction

1.    This Court has jurisdiction over the subject matter of this civil action pursuant to 42 U.S.C. § 1981.

1

## Venue

2.     Venue is proper in this judicial district under 42 U.S.C. Section 2000e-5(f)(3) and 5 U.S.C. § 7703(b)(2); as most of the events alleged in this complaint occurred in this judicial district; Plaintiff's employment records are maintained by the Defendant in this District; the store Plaintiff worked at, is located in this District; and decisions adverse to Plaintiff's employment that are the subject of this civil action were made in this District. All the Defendant's agents/witnesses mentioned in this complaint worked for the Defendant in this District and took action against Plaintiff while acting within the scope of their employment with the Defendant.

## Parties

3.     Plaintiff Victoria Smith, a black female of 64 years of age, is a citizen of the United States and a resident of Texas.

4.     Defendant Whataburger Restaurants, LLC is a domestic limited liability company engaging in business in the state of Texas. Defendant may be served with process by serving its registered agent, Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, TX 78701

## Statement of Facts

5.     Plaintiff, Victoria Smith, worked as a restaurant manager for Denny's restaurant for approximately thirteen years without incident.

6.     Around 2007, Defendant Whataburger hired Smith as a Restaurant Manager.

7.     Defendant Whataburger is a National Food Safety certified restaurant chain. The National Sanitation Foundation rigorously tests, audits, and certifies an array of products

2

and services to ensure they meet or exceed requisite standards. It  routinely sends inspectors to audit Whataburger's restaurants and score them to ensure compliance with its rigorous standards.

8.     Indeed, the National Sanitation Foundation ("NSF") is a global organization that develops and certifies products for public health and safety, including in the food industry. Its certification ensures that food equipment is hygienically designed and constructed with food-grade materials, making it easier to clean and maintain sanitation standards. The NSF certification on products signifies that they have met rigorous public health and safety standards.

9.     Right from the inception of her employment with Defendant and throughout, Smith consistently gives her best efforts to Defendant and its customers. Smith always manages her shift impeccably, ensuring the highest standards in food safety, quality, and service.

10.    For that reason, Smith was put on the schedule and shift whenever NSF is expected at the Whataburger for inspection of the premises.

11.    Upon inspection for compliance by NSF, Smith's Whataburger store would always receive  scores in the upper 90s if not a perfect score of 100.

12.    Due to Smith's exemplary performance, Smith became the go-to manager to be scheduled for the day shift that Defendant expects an NSF inspection.

13.    Defendant has Operating Partners ("OP") in its stores. The Operating Partner is the overall manager for each of the stores. Right beneath the Operating Partners are restaurant managers. Beneath the restaurant managers are Team Leads  and then the crew members

14.    Around 2018, Samuel Ambriz ("Ambriz"), a Hispanic male, was the Operating Partner for Whataburger Store #1019. At that time, store #1019 was severely under-staffed.

15.    Ambriz had multiple different Restaurant Managers from other stores transfer temporarily to Store #1019 to assist. None of them were able to keep up with the workload and ensure the store ran smoothly.

16.    Thus, Ambriz became desperate for a Restaurant Manager who could maintain his struggling under-staffed store.

17.    Eventually, Smith was directed to periodically assist in Ambriz's store. Smith was the only Restaurant Manager who could successfully handle and keep up with the workload at Store #1019 and keep it running.

18.    Seeing Smith's outstanding performance and how she was able to resuscitate Ambriz' store, Defendant permanently transferred Smith to Ambriz' store.

19.    At that time, Smith was the only black Restaurant Manager in Ambriz's store.

20.    At Store #1019, the busiest shift and hours were the night shifts and weekends.

21.    At store #1019, there were inter alia, Ana Castro ("Castro"), Restaurant Manager, a Hispanic female and Shafaq Chowdry ("Chowdry"), Restaurant Manager, a Pakistani female.

22.    When Smith first met Chowdry, Chowdry gave Smith a condescending, snobbish look. Chowdry then refused to interact with Smith. Whenever Smith greeted her, Chowdry ignored her. Whenever Smith tried to talk to her, Chowdry refused to respond. Smith was like a ghost to Chowdry.

23.    A month thereafter, however, Chowdry got sick of seeing Smith. She began calling Smith a "black bitch" two to three times a week.

4

24.     Smith tried to talk to Chowdry to ameliorate the situation. But, Chowdry refused to interact with her and continued to treat Smith like a cockroach. Whenever Smith tried to talk to Chowdry, Chowdry would call her a "black bitch."

25.     Meanwhile, Smith demonstrated excellence and trained the other restaurant managers. They became more efficient and effective.

26.     Nonetheless, Castro subjected Smith and other black employees to intense, microscopic scrutiny while giving preferential treatments to the Hispanics, non-black, and white employees.

27.     For example, whenever the workload is light and Smith or a black employee converses with a customer for a few minutes, Castro complains to Ambriz that they are not doing their job. In contrast, a Hispanic, non-black or white employee would converse with a customer, even for sometimes over 5-10 minutes, Castro overlooks it and until sometimes when she has to take over the workload of the conversing employee.

28.     For another example, whenever a black employee forgets to place a label on one of the food products/items, Castro broadcasts that they failed to label food items. Yet whenever a Hispanic, non-black or white employee forgets to place a label, Castro ignores it.

29.     For another example, whenever a black employee leaves an expired product on the shelf, Castro criticizes and degrades them. Yet whenever a Hispanic, non-black or white employee leaves an expired product on the shelf, Castro would not ignore it.

30.     For another example whenever a black employee leaves some trash in the trash can caddy, Castro accuses them of laziness. However, whenever a Hispanic, non-black or white employee forgets to take the trash out altogether, Castro creates excuses for them.

5

31.   For another example, whenever a black employee makes a tiny omission, Castro repeatedly grumbles to Ambriz about it and accuses them of being incompetent. Yet when a Hispanic, non-black or white employee commits a grave error, Castro not only overlooks the error but also asks Ambriz to grant them clemency.

32.   This is how Castro treats and discriminates against black employees every day, except when it is so blatant and unmistakable and somebody voices it out. Then she would be unusually nice to one black employee to cover up.

33.   In many instances, Ambriz himself observed Castro's behavior. Instead of taking corrective actions against Castro, Ambriz rubber-stamps Castro's behavior and even also perpetrates further discrimination against blacks in the terms and conditions of their employment.

34.   For example, Ambriz routinely schedules blacks for work during the restaurant's busiest hours. Conversely, Ambriz takes the Hispanics, non-blacks and whites off schedule during the busiest hours.

35.   For another example Ambriz routinely denies black employees' requests for days off  while he regularly grants Hispanic, non-black and white employees such similar requests.

36.   For another example Ambriz almost never gives black employees Saturday and Sunday off while he routinely schedules the Hispanics, non-black and whites off for the entire weekend.

37.   For another example whenever a black employee like Smith calls off their shift, Ambriz would deliberately delay their resumption date/time so that he can cut their hours and distribute it to another Hispanic employee. Whenever a Hispanic employee calls off

6

their shifts, they can resume their regular working hours right away upon their return.

38. For another example whenever a Hispanic, non-black or white employee needs to take off early, they can just notify Ambriz and leave. Whenever a black employee like Smith needs to leave early, they must take it out with the manager working with them and still be denied their request.

39. In fact, on many occasions, Castro left her shift early without notifying Ambriz and the restaurant manager. Castro suffered no consequences.

40. Ambriz continually tries to find fault with black employees like Smith while excusing the transgressions of Hispanic, non-black and white employees.

41. Ambriz repeatedly hires Hispanics but disapproves of blacks working at his store.

42. Ambriz and Castro constantly discriminate against the blacks in the store. They would pretend to be nice to a black person sometimes when they need to cover up their discrimination.

43. Around early 2019, Smith complained to Ambriz that she, *inter alia,* was being discriminated against and subjected to a hostile work environment because of her race. Ambriz muttered some words and walked away.

44. Shortly thereafter, the discriminatory hostility Smith suffered under Chowdry, Castro, and Ambriz intensified.

45. Chowdry began calling Smith "stupid black girl" three to four times a week.

46. Smith tried to ignore Chowdry. Chowdry then progressed to calling Smith "stupid black bitch" three to four times a week.

47. Eventually, Chowdry not only called Smith "stupid black bitch" three to four

times a week but also called Smith "stupid black bitch" in the presence of Ambriz.

48.    Instead of taking corrective action, Ambriz dismissed it and looked away. Smith then Called the matter to Ambriz' attention. Ambriz simply walked away.

49.    Meanwhile, Castro began a campaign of maligning Smith's performance.

50.    As part of her job duties, Smith must ensure food items have expiration labels and remove expired products from the shelf. Whenever Castro checks the food and product labels affixed by Smith, Castro would inform Smith that "everything is good" and that she "will take care of the rest." After Smith leaves, Castro would then take pictures of the products without labels or with expired labels and texts it to everyone on the Manager Grouptext to create the false impression that Smith did not do her job.

51.    Thus, Smith began to check and ensure that every food item and product had proper labels, whenever Castro is scheduled concurrently with or right after Smith,

52.    In response, Castro yanked off the labels placed by Smith or directed an employee to yank off those labels so she could post more pictures of food items and products without labels on the Manager Grouptext to malign Smith's performance.

53.    When it became clear the food labels were being yanked off, Castro attached expired labels or directed a Hispanic employee to attach expired labels onto fresh products to further sabotage Smith's performance.

54.    Castro continued this untoward behavior almost incessantly. Eventually, Smith assigned a fellow employee to eyewitness her affixing proper labels onto food products, whenever Castro was scheduled concurrently with or right after Smith.

55.    Thereafter, Castro became aware that her deeds were exposed. Thus, she switched her focus to the trash can caddy. Whataburger policy requires that trash be taken

8

out before dark. During a busy shift, the trash can caddy can accumulate trash, even after trash had already been taken out. This will occur when there is a sudden rush of customers after the trash had been taken out or emptied.

56.     In furtherance of her scheme to sabotage Smith's performance, Castro repeatedly took pictures of trash left in the trash can caddy during busy shifts and posted those pictures on the Manager Grouptext, claiming that Smith was lazy and failed to take out the trash.

57.     Again, Smith had to assign a fellow employee to eyewitness her taking out the trash. Then Castro's scheme was exposed.

58.     When Castro got caught on the trash can caddy, she switched again to food delivery. On many occasions, the food delivery truck would arrive near the end of Smith's shift. The employee scheduled after Smith would sort through the inventory and empty some of the old items to have enough space to put up the new delivery. In doing so, the employee left empty boxes. Castro took pictures of these empty boxes, posted them on Manager Grouptext, and falsely claimed that Smith left those empty boxes.

59.     Castro incessantly takes pictures of things that "appear off" or not proper during Smith's shift, even when things were just usual operations, so as to malign Smith's performance. Castro, however, did not do so or exhibited any of these untoward misconduct to other non-black employees.

60.     Smith complained to Ambriz about Castro's and Chowdry's maltreatments and discriminatory conduct. Ambriz however actively supported Chowdry and Castro's actions against Smith.

61.     Instead of defusing or ameliorating the situation, Ambriz perpetrated subjecting Smith to intense hostility, Ambriz repeatedly scheduled Chowdry together with Smith and

scheduled Castro after Smith.

62. On one occasion in 2019, Chowdry was supposed to be transferred to another store. Ambriz moved heaven and earth to overwrite Chowdry's transfer at the eleventh hour and encouraged Chowdry's continuation of subjecting Smith to a hostile work environment.

63. Additionally, because of Smith's complaints, Ambriz subjected Smith to discriminatory treatments in the terms and conditions of her employment.

64. Ambriz refused to schedule Smith on the morning shifts unless an NSF inspection was expected. Meanwhile, Hispanics, non-black and whites are routinely scheduled in the mornings.

65. Smith repeatedly requested that she be allowed to take Sundays off to attend church service. Ambriz refused to give Smith her Sundays off.  Yet, Ambriz always gave Chowdry Fridays off so Chowdry could visit the mosque.

66. Unbeknownst to Smith, her vacation time increased due to her tenure at Whataburger. Ambriz failed to inform Smith that her vacation time had increased but informed other non-black employees when their vacation time increased.

67. To strip Smith of taking a vacation, instead of deducting Smith's pay whenever she took time off work, Ambriz would manipulate Smith's vacation time by applying her vacation time against Smith's request for days off. Ambriz did not manipulate the vacation time of other non-black employees.

68. Ambriz always berates Smith whenever she asks whether she could take leftovers home. Yet he allowed Chowdry to not only eat food at Whataburger but also to take food home without paying. Chowdry would often brag about this.

69. Ambriz repeatedly refused to order new uniforms for Smith, even though the

uniform Smith had was revealing, embarrassing, and based on an older template. Indeed, the manager's jacket Smith had was a very old design that had been replaced with a much nicer jacket reflecting the stature of the manager's position. Yet, Ambriz readily ordered and provided new uniforms for his other non-black employees.

70. Around late 2019, Smith learned that Ambriz had been actively trying to push Smith out of Store #1019, so he could bring in a Hispanic restaurant manager.

71. The store Ambriz wanted to push Smith to, was one which Ambriz had previously described as "where your Whataburger career ends" and "one of the worst."

72. When Ambriz informed Smith that she would be transferred to "one of the worst" stores, Smith asked him why she would be the person to be transferred and not the employees she had complained about. Ambriz then told her to "forget it."

73. Nonetheless, Ambriz was unrelenting in trying to get rid of Smith. He continually scheduled Smith with Chowdry so Smith could be subjected to derogatory racial slurs almost every day.

74. One Genard Howard, who worked at Whataburger as a Porter, witnessed Chowdry's derogatory, racial slurs used on Smith and even African American customers. Howard observed that Chowdry uses "black bitch" as if blackness is a disease.

75. Castro, meanwhile, continued to malign Smith's performance and subjecting her to intense, microscopic scrutiny.

76. Around May 9, 2020, during the height of the COVID-19 pandemic, unbeknownst to Smith, Smith caught Covid. When she came in for her afternoon shift, Smith was constantly sneezing and coughing. Ambriz took her temperature and saw it was higher than 102 degrees Fahrenheit. Smith immediately requested that she be released to go

to the hospital. Ambriz denied the request and claimed that Smith's temperature was not high enough to go see a doctor.

77.    At that time, Ambriz was scheduled to work from 10 AM – 8 PM. "Mariana," another Hispanic  manager, was scheduled to work at 10 PM. Because a Whataburger store must have a manager on duty to operate, Smith was scheduled to work until 10 PM before she could be relieved.

78.    Thus, Smith requested that Ambriz have Mariana come in at 8 PM so she could leave early and seek treatment. Ambriz, however, refused and forced Smith to work through her shift.

79.    When it was finally 10 P.M. and Mariana arrived, Smith's condition had deteriorated so much that Smith could no longer drive her vehicle and leave immediately. Mariana exclaimed that, she would have come much earlier had she known Smith was sick, as she was available and she didn't know why nobody called her.

80.    Due to her ailing health, Smith called her family members to pick her up as she could not drive. They did, and immediately rushed her to the hospital.

81.    That same night, Smith was admitted to Houston Methodist Sugar Land Hospital, where she was in critical condition. She remained there for five days.

82.    Ambriz had never treated a non-black employee the way he treated Smith.

83.    Once Smith recuperated from Covid and resumed work, Chowdry, Castro, and Ambriz's continued their discriminatory treatments against Smith. Chowdry repeatedly subjected Smith to intense verbal abuse and harassment by calling her "stupid black bitch" almost every day. Castro subjected Smith to persistent, intense psychological abuse by constantly trying to taint, sabotage or malign Smith's performance.

12

84. Meanwhile, Ambriz, spearheaded, encouraged and engaged in willful blindness to the torment and torture, Smith suffered at the hands of Castro and Chowdry. Ambriz was constantly inducing Smith to leave or resign so he could bring in a Hispanic restaurant manager.

85. Indeed, on many occasions, especially when Smith complained about the mistreatments and discrimination she was suffering, Ambriz told Smith: "you don't have to stay here if you don't like it here."

86. Chowdry, Castro, and Ambriz's discriminatory treatments against Smith continued unabated and in fact, worsened. Ambriz worked with utmost alacrity to dispirit and demoralize Smith.

87. Ambriz began placing Smith on the busiest shifts to overwork her. When Smith fulfilled her duties without complaints, Ambriz reduced Smith's staff so that she was shorthanded or short-staffed.

88. Despite being shorthanded, Smith performed resoundingly and maintained commendable productivity.

89. This was mainly because while Ambriz and his cohorts demoralized Smith with their hostility, the customers applauded and commended her. They even told her they called the Defendant's office to inform them of Smith's outstanding performance

90. In one of Ambriz' attempts to deprecate Smith's performance and make her look like a failure, Ambriz placed a totally inexperienced new hire (who Ambriz described as "almost useless") on Smith's shift and directed Smith to train him. This new hire could not do anything right. When he was assigned to the frying station, he dropped the thermometer into the hot oil, frying the thermometer. When he was assigned to clean the filter pan, he

13

cut himself, even though there was no sharp object at the station. Despite the new hire's numerous slip-ups, Smith still managed her shift and maintained productivity particularly because of the encouragements she received from customers.

91.   Thus, Ambriz resorted to berating Smith for issues beyond her control. Whenever Smith was managing an extremely short-staffed and busy shift, Ambriz complained that the service was too slow. Whenever Smith was scheduled with another restaurant manager and that restaurant manager made a mistake, Ambriz blamed Smith for the error. On some occasions, Ambriz berated Smith for things that occurred when she was not present at the store. Some of the accusations were so ridiculous that another restaurant manager spoke out against Ambriz in support of Smith. Nonetheless, Ambriz continued his discriminatory treatments against Smith throughout.

92.   In contrast, Ambriz gave non-black employees lighter shifts with more personnel and did not berate them for issues beyond their control. Chowdry, Castro, and Ambriz's maltreatment of Smith continued unrelentingly.

93.   Around early 2023, Smith's ServSafe Manager Certification was coming up for renewal. ServSafe is a rigorous, comprehensive educational program developed by the US National Restaurant Association encompassing a wide range of topics such as food safety principles, hazard control, and sanitation practices. To successfully renew ServSafe Manager Certification, individuals must not only update themselves in its vast topics, but also score a firm 75% or higher on a 90-question standardized proctored exam.

94.   Ambriz suddenly scheduled Smith to take the test to renew her ServSafe Manager certification and gave her less than a week's notice, even though she still had two months left before her certification expired.

95. Moreover, Ambriz placed Smith on a very tight schedule that week so that she would not have any time to study or sleep.

96. At that time, Ambriz's store only had one English ServSafe textbook on site. Smith asked to take the textbook home to read so she could study for the exam. Ambriz refused.

97. With no other choice, Smith complained to Ambriz's supervisor, Mohammad Quaini, ("Quaini") of Middle-Eastern descent, regarding the circumstances. After an extended delay, Quaini directed Smith to take the English ServSafe textbook home so she could study.

98. By that time, however, Smith only had one night left to study for the exam. Smith did the best she could studying the materials. The following day, Smith proceeded to the test site to take the exam.

99. When she arrived, Smith learned that her name was not even on the list of examinees to be tested. Nonetheless, Smith took the exam and, against all odds, passed it with an 87% score.

100. In contrast, Ambriz gave Castro ample time and notice to study for her ServSafe exam. Nonetheless, despite trying at least four times if not more, Castro could not pass the exam to renew her certification. Not wanting Castro demoted, Ambriz contacted the ServSafe instructor employed by Whataburger and pulled some strings. Shortly thereafter, Castro passed the exam.

101. After Ambriz' failed attempt to sabotage Smith's ServSafe renewal, Ambriz, Chowdry, and Castro continued to subject Smith to a shockingly cruel, hostile work environment motivated by racial animus.

102.  Chowdry began openly mocking and ridiculing Smith, constantly cursing her out while continuing to call Smith a "stupid black bitch" almost every day.

103.  Castro placed Smith under intense scrutiny almost every day, fabricating falsities and lies against Smith.

104.  Ambriz continued discriminating against Smith in the terms and conditions of her employment.

105.  Around early 2023, Smith became ill while working her shift. She asked Ambriz to release her so she could seek medical treatment. Again, Ambriz refused. He claimed that Smith should have known that she was ill before she came to work. Yet again, Smith was forced to work through her shift. Thereafter, Smith was rushed to the doctor and diagnosed with Covid.

106. Meanwhile, Ambriz always permitted Castro and Chowdry, both non-black Restaurant Managers, to leave their shifts early if they became ill while working. In fact, Chowdry constantly left her shift early to work a second job. In fact, Ambriz always permitted Chowdry to wear the uniform of her second job (Walmart) at Whataburger.

107.  Around mid-2023, Smith complained to Quaini, Ambriz's supervisor, about the constant discriminatory and hostile work environment she endured under the hands of Chowdry, Castro, and Ambriz.

108.  Quaini responded that he would look into the matter and talk to Ambriz.

109.  Shortly thereafter, Ambriz denied Smith's request to leave one hour early for a back pain appointment she had scheduled and informed him weeks ago. Smith even called Quaini, but he did not respond. Smith had no choice but to cancel the appointment.

110.  A few days later, when Smith saw Quaini and inquired about the status of her

complaints and added that Ambriz, denied her request to leave one hour early for doctor's visit.

111.  Quaini stated that perhaps Ambriz was just trying to teach her a lesson after receiving word about her complaints to Quaini.

112. Nothing was done. Smith continued to suffer constant, discriminatory, hostile work environment under Chowdry, Castro, and Ambriz. Thus, Smith complained to Mohammad Quaini a *second* time regarding the matter.

113.  Again, Quaini responded that he would talk to Ambriz.

114. Shortly thereafter, Whataburger had a NSF inspection at Smith's store. Smith was scheduled to be the manager in charge of the shift. The NSF inspector arrived, inspected the store, and discussed her results with Ambriz when he arrived. Unbeknownst to Smith, the NSF inspector gave Smith a perfect score of 100. Instead of congratulating and celebrating Smith's exemplar performance, Ambriz intentionally withheld the score from Smith. He contacted Quaini, claimed that he was the one who managed the shift, and took credit for Smith's hard work.

115. In contrast, when Castro was the manager in charge and scored around a 90, Ambriz was celebrating and broadcasting her achievements to the entire team. In another instance, when a Hispanic manager scored a perfect score, Ambriz was ecstatic and announced to the entire team how proud he was for the Hispanic manager. The Hispanic manager had to remind everyone that were it not for Smith's excellent work beforehand, he would not have been able to get the perfect score.

116. When Smith discovered Ambriz's unscrupulousness, Smith complained to Quaini. Quaini had to apologize on Ambriz's behalf and again, noted that Ambriz was

17

probably upset after receiving word of her complaints.

117. Nonetheless, despite complaining twice and Quaini apologizing, nothing was done. Smith continued to suffer constant, discriminatory, hostile work environment at the hands of Chowdry, Castro, and Ambriz. Thus, Smith complained to Quaini yet again for a *third* time.

118. Shortly after her third complaint, Quaini contacted Smith and asked that she overlook Chowdry's behavior because she is a single mother. Smith responded that Chowdry's "children" are already full-fledged adults. Quaini replied that Smith needs to be lenient towards her fellow coworkers and her boss; and that if she couldn't work with them, he could transfer her to another store. That other store is the very one that Ambriz had wanted Smith transferred to – the one "where your Whataburger career ends" and "one of the worst."

119. After this conversation, Quaini began avoiding Smith. Meanwhile, Chowdry, Castro, and Ambriz's hostility and discrimination continued.

120. Eventually, the conditions were so deplorable that Smith lodged complaints about Chowdry, Castro, and Ambriz discriminating against her to Whataburger Human Resources (HR).

121. HR promised to investigate the matter. But, nothing changed.

122. Chowdry continued calling Smith "stupid black bitch" almost every day. Whenever Smith tried to talk to Chowdry about something related to the job, Chowdry would tell Smith to "shut up."

123. Castro continued fabricating falsities and lies against Smith. Whenever Castro made a mistake, she pinned the blame on Smith.

124. Ambriz continued subjecting Smith to discriminatory terms and conditions of employment based on her race. For example, Ambriz continued shuffling Smith to heavy, busier shifts so as to short-staff and exhaust Smith, while removing non-black employees from those busy shifts to lighter shifts.

125. Because of Ambriz' deliberate schedule shuffling with Smith, Ambriz ended up scheduling so many non-black employees for lighter shifts that even Whataburger corporate noticed a disparity. Specifically, Whataburger observed and communicated to the store that the labor expenses were way too high compared to the sales made and dictated targets for the store to reach.

126. In response, Ambriz filled Smith's busy, short-staffed shifts with two to three Hispanic and Asian new hires who had no experience working at a fast food restaurant. Smith had to train these new hires, half the time while working her shift. Because of their lack of experience, not even three of these new hires combined can match the productivity and output of an experienced employee.

127. Despite these challenges, Smith still ensured the store ran smoothly and maintained productivity. Notably, Smith maintained some of the lowest labor costs to sales revenue percentages. This means that Smith was able to sell significantly more product with less labor costs compared to other managers.

128. Ambriz repeatedly praised non-black managers who maintained low labor costs to sales revenue percentages. Whenever a non-black manager maintained a percentage less than 35%, Ambriz compliments them and announces it to the team. For example, Ambriz gloated about Castro managing a shift with a labor costs to sales revenue percentage of approximately 32%.

129. Yet, when Smith successfully ran a shift with a labor costs to sales revenue percentage of 18.8% later that same day, Ambriz was completely silent and made no compliments or applaud Smith. Significantly, Smith regularly ran shifts with less than 25% labor costs to sales revenue, but rarely if ever gets any compliments from Ambriz. Instead, Ambriz would pull her aside and ask, "are you satisfied with how your shift went?" Smith responds that it could be better. Then, Ambriz asks accusingly, "well, why don't you make it better?" Smith would say "I'd make it better if you all stop this hostility and discrimination."

130. Smith had to explain to Ambriz each time that she has to deal with extraneous factors beyond her control - such as being short-staffed and having to train multiple new employees on the job – all of which were caused by Ambriz.

131. To further hinder Smith's performance, Ambriz began scheduling Smith at odd hours. Specifically, Ambriz would schedule Smith one shift late into the evening and also the next early in the morning so that she would be worn out and tired when she came in for her morning shift. Other non-black employees were not given such shifts. Despite Chowdry, Castro, and Ambriz's unabated discriminatory, hostile treatments toward Smith, Smith continued giving her best efforts to Defendant.

132. Around October 28, 2024, Ambriz was transferred to another store. Prior to his departure, Ambriz had a conversation with Anthony Castillo, his replacement, regarding Smith and how she should be treated.

133. Castillo, however, did not follow Ambriz's directive. He gave Smith morning shifts, time off during weekends, better staffing for busy shifts, and dealt with problems more objectively.

134. With Castillo around, it became increasingly difficult for Castro, to fabricate falsities and lies against Smith and subject her to microscopic scrutiny. As a result, she transferred out to Ambriz' store to work with him.

135. Despite the improvement in the atmosphere, Chowdry's nearly every day racial epithets against Smith continued unabated. When Smith complained to Castillo regarding Chowdry's behavior, Castillo indicated that his hands were tied because Chowdry had Quaini's support. Chowdry and Quaini are both Middle-Easterners.

136. Nonetheless, to assist Smith, Castillo placed Chowdry and Smith on different schedules and further apart. But, even with the new schedule, Chowdry and Smith would still overlap around three to four times a week. At every opportunity, Chowdry calls Smith "stupid black bitch."

137. Around February 2025, shortly after Smith's rescheduling by Castillo, Defendant transferred Castillo away from Store #1019 and brought in Sandra Lopez, another Hispanic female, to replace him.

138. Sandra Lopez, Samuel Ambriz, and Ana Castro all previously worked together at Jack in the Box before coming to Whataburger. Lopez and Castro were particularly close.

139. Thus, shortly after Lopez transferred to Smith's store, Castro transferred back to Store #1019, to work under Lopez.

140. Shortly after her transfer, Castro directed Lopez to remove Smith and other non-black employees from all morning shifts. Lopez complied.

141. Castro additionally directed Lopez to schedule Smith and other non-black employees to work on weekends. Lopez agreed.

142. Castro further directed Lopez to schedule Smith and other non-black employees

21

at odd hours. Again, Lopez obliged.

143. Whatever Castro wanted to do to discriminate against black employees in the terms and conditions of their employment, Lopez actively encouraged and supported it.

144. Thus, Smith was again placed under intense microscopic scrutiny, dealing with the fabrications and falsities machinated by Castro and rubber-stamped by Lopez.

145. Smith was again subjected to and endured working grueling, busy shifts while short-staffed.

146. Smith was again subjected to being scheduled to work with Chowdry and had to endure her openly racial epithets almost every day.

147. Due to Lopez's discriminatory hostility towards Smith and her open support for Chowdry and Castro, Smith's workplace environment became permeated with hostility and abuse. The hostility was sufficiently severe and pervasive as to alter the terms and conditions of Smith's employment.

148. Lopez not only continued the severe, pervasive, cruel, discriminatory hostile work environment engineered, perpetrated and perpetuated by Ambriz against Smith but also heightened it.

149. Lopez began scheduling Smith to work shifts that are 12 hours or longer. Other non-black employees were not scheduled to work for such a duration.

150. Whataburger employees are required to spend time during their shifts to watch training videos so they are updated on properly handling customers and ensuring food safety. Lopez continually scheduled Smith on extremely busy shifts and denied her requests to watch the training videos so as to make it exceedingly difficult for Smith to complete them.

151. In contrast, for other non-black employees, Lopez gave them adequate time to watch the training videos and complete them. For Hispanic employees, Lopez even offered to access their accounts and watch the training videos in their stead so that they can leave early or do something else.

152. Lopez has repeatedly done so for Hispanic employees. Two other non-Hispanic Operating Partners also did the same thing for their employees. When Whataburger investigated the other two Operating Partners and discovered that they were accessing employee accounts and watching training videos in the employee's stead, Whataburger immediately terminated their employment.

153.  Yet, when Whataburger investigated Lopez and confirmed that she did the exact same thing for her Hispanic employees, Whataburger did not terminate Lopez. Instead, Lopez was allowed to continue her employment. The only difference between Lopez and the other two Operating Partners was that Lopez was Hispanic while the other two were not.

154. Lopez also repeatedly scheduled Smith or called her in for work or meetings the day or night before, while Smith was off duty. For example, around late April of 2025, Smith became ill. She was released to return to work around Tuesday, April 29, 2025. At that time, Smith inquired and confirmed that Lopez did not schedule her for work.

155. Late Wednesday evening, which was the next day, Lopez suddenly called Smith to come in early the next day. Out of deference to Lopez, Smith came by the next day and fulfilled the shift. After Smith completed her shift, Smith checked her schedule and found that Lopez still has not scheduled her for the remainder of the week. Again, Smith asked and confirmed that she was not scheduled. After receiving confirmation, Smith made her

plans for the rest of the week.

156. Suddenly, late Friday evening, Lopez scheduled Smith for shifts on Saturday and Sunday. Yet again, Smith was given less than a day's notice to attend a shift. Due to Smith's prior arrangements, she was unable to attend.

157. Lopez did this repeatedly, modifying Smith's schedule at will and calling Smith in for work or meetings the day or night before. Lopez, however, did not do this to other non-black employees. Other non-black employees were notified of their schedules or meetings around a week in advance. In fact, Whataburger policy requires that an employee's schedule be posted around a week in advance so that the employee can plan around the schedule. Nevertheless, Lopez derogated Whataburger's policy so as to discriminate against Smith through the terms and conditions of her employment.

158. Furthermore, around this same time, Lopez deceptively took Smith's employee number, confirmation number, and login information to access Smith's account and clandestinely dropped Smith from the schedule for an entire week.

159. Oblivious of that fact at that time, Smith proceeded to work as usual and worked the entire week Lopez dropped. When the week passed, Lopez suddenly accused Smith of dropping her schedule for the entire week. Smith investigated and soon realized that Lopez accessed her account and sabotaged her schedule. When Smith inquired about the matter and asked why Lopez accessed her account, Lopez backed off, stating, "don't worry. I'm not sweating it."

160. Lopez did not access the accounts of non-black employees, drop them from the schedule without their knowledge, and accuse them thereafter as she did Smith.

161. Around early May of 2025, Whataburger celebrated teachers' appreciation day.

Rosa, a Hispanic female cook, made about 3 honey butter chicken biscuit sandwiches. Smith picked one to give for a teachers' appreciation order. Before Smith could complete the order, Rosa asked to inspect the sandwich and swapped the chicken for a piece that's half the size of the original. Rosa claimed that the half-size chicken piece is for the teachers' appreciation order because they were getting it for free.

162. Smith rejected Rosa's idea and decided to combine the small piece of chicken with another small piece to make a standard-size chicken sandwich. Instead of giving deference to Smith, who is Rosa's second-level supervisor, Rosa was insubordinate and repeatedly tried to snatch the second chicken piece from Smith.

163. When Lopez came in a few minutes later, Lopez immediately supported Rosa over Smith and claimed that Smith should have followed Rosa's directive (even though Rosa was two levels beneath Smith). Smith complained that Lopez was openly creating a discriminatory, hostile work environment for her.

164. Shortly thereafter, Lopez promoted Rosa to Team Lead and wrote Smith up for dropping her schedule and failing to work her Saturday and Sunday shifts.

165. The dropped schedule was the very one Lopez fraudulently created against Smith, when Lopez improperly accessed Smith's account.

166. The Saturday and Sunday shifts were the very ones Lopez suddenly scheduled Smith for, with notice given just the night before, (against Whataburger policy) after Smith confirmed multiple times that she was not placed on the schedule.

167. The write-up by Lopez was so baseless that after Smith complained to HR, HR rescinded it.

168. Lopez not only continued to support Castro and Chowdry's discriminatory

behavior towards Smith but also encouraged others to join. Rosa, whom Lopez empowered, got physical against Smith on multiple occasions. Castro began to slap Smith's buttocks multiple times each week. Significantly, Rosa was not physical to other non-black employees. Castro did not spank or slap the buttocks of other non-black employees.

169. Around June 4, 2025, Castro spanked Smith's butt twice in one day. Tired of Castro's constant physical abuse, Smith complained to Lopez. Lopez automatically defended Castro, called Smith a liar, and falsely accused Smith of failing to speak to a customer. Castro's behavior continued unabated.

170. The workplace environment became so hostile that Smith complained to both HR and Quaini about discrimination and hostile work environment. Just like her prior complaints, no actions were taken. Instead, Lopez retaliated by soliciting and fabricating false complaints against Smith.

171. For example, Smith complained to Lopez about Chowdry constantly making and eating chicken sandwiches without paying. Shortly thereafter, Lopez discovered that the store was missing approximately three bags of chicken. Instead of investigating Chowdry's conduct, Lopez automatically blamed Smith for the missing bags of chicken.

172. On another occasion, Castro asked Smith whether Paula Duggins, a Team Lead, can obtain a discount on a 10-burger box for her to take home. Smith directed them to contact Lopez to obtain approval. Instead of receiving consent from Lopez, Castro gave Duggins the discount. The following day, Lopez wrongfully and baselessly berated Smith for improperly giving Duggins a discount. When Castro confessed that she gave the discount, Lopez became silent and walked off.

173. Not content with all that, Lopez began to constantly watch video footage of

Smith's work schedule, to find fault or things she did wrong. Despite her best efforts, Lopez was unable to find anything of merit. Lopez however, does not watch video footage of other non-black employees shift, even when they were accused of wrongdoing.

174. Around August 10, 2025, Smith ran a shift with Chowdry. During that shift, Chowdry instructed her team leader to close the dining room kitchen early, even though Whataburger policy requires the dining room kitchen to be open until midnight. Whataburger policy further requires that the store keep a second lane open on the drive-through and use it until 2:00 A.M. Chowdry instructed the staff to close the second lane of the drive-through before 2:00 A.M.

175. During this time, Smith was cleaning the dining room and the bathroom and had no input on the matter. Nevertheless, Lopez thereafter wrote Smith up for closing the dining room kitchen early and not using the second lane of the drive-through. Chowdry, the Restaurant Manager who was responsible for the early closures, suffered no consequences.

176. Yet again, Smith had to lodge complaints about this baseless write-up to HR. HR rescinded the write-up.

177. But, the hostility Smith endured under Lopez, Chowdry, Castro, and Rosa became so severe and pervasive that it caused Smith's blood pressure to spike. Around August 2025, Smith had to take multiple days off to see the doctor.

178. In the meantime, to create the false impression that she does not discriminate against black employees, Lopez hired a couple of African American staff. Indeed, shortly after their hire, Lopez would transfer them out or fire them. Sure enough, this happened after Smith complained about Lopez.

179. In one instance, a black Team Lead from another store, Haretta, sought to

transfer to Lopez's store because it was closer to her home. Haretta was an excellent cook and a great all-rounder, particularly in the kitchen. At the time, Lopez had announced repeatedly that she needed all-rounder Team Leads for the night shift because it was severely short-staffed. Haretta was available to work during the evening/night shift. Thus, Smith recommended Haretta to Lopez. Lopez not only rejected the recommendation but also informed Haretta that she doesn't have any openings, despite previously announcing that she specifically needed all-rounder Team Leads for the night shift because it was short-staffed.

180. Despite all of the complaints Smith lodged to HR and Quaini regarding Ambriz, Lopez, Chowdry, Castro, and Rosa, their discriminatory treatments continued unabated.

181. Around early November 2025, a few weeks ago, Lopez scheduled Smith to work for nine consecutive days, in violation of Texas law. Other non-black employees were not scheduled to work for nine consecutive days.

182. Due to the Defendant, its agents and employees' conduct, Smith had been in treatment for the past years due to mental anguish, emotional distress and loss of self esteem.

183. Defendant its agents and employees intentionally discriminated against Smith due to her race.

184. But for Smith's race, Defendant, its agents and employees would not have discriminated against her.

185. But for Smith's race and/or complaints, Defendant, its agents and employees would not have retaliated against her.

186. But for Smith's race, Defendant, its agents and employees would not have

subjected her to a hostile work environment.

187. Plaintiff is black female who is continuously being subjected to intentional racial discrimination, and that the discrimination concerned her employment relationship with the Defendant and its employees.

188. Smith has suffered significant discrimination and retaliation as well as discriminatory hostile work environment for approximately 7 (seven) years.

189. The discrimination suffered by Smith is serious and tangible enough to alter Smith's compensation, terms, conditions, or privileges of employment.

190. Defendant and its employees subjected Plaintiff to a retaliatory hostile work environment for seven years and up until the present date.

## COUNT I – HOSTILE WORK ENVIRONMENT

191. Plaintiff Smith re-alleges and incorporates all applicable paragraphs above into this paragraph.

192. Defendant Whataburger and its employees, subjected Smith to unwelcome harassment based on her race. The harassment was sufficiently severe or pervasive to alter Smith's conditions of employment and created an abusive working environment for her. The harassment was both subjectively and objectively perceived as abusive; and Defendant knew or should have known about the harassment and failed to take prompt remedial action against the harassers its Ambriz, Lopez, Chowdry, and Castro despite multiple complaints by Smith.

193. As a result of Defendant or its agents' conduct, Smith suffered harm and continues to suffer harm that she would otherwise not have suffered had Defendant

taken prompt, immediate remedial action against Ambriz, Lopez, Chowdry, and Castro.  Defendant and/or its agents/employees' conduct was a substantial factor in causing Smith's  harm.

## COUNT II – RETALIATION

194.  Plaintiff Smith re-alleges and incorporates all applicable paragraphs above into this paragraph.

195.  Smith engaged in multiple protected activities when she complained multiple times about hostile work environment and discrimination.

196.  After her complaints, Smith was subjected to a severe and pervasive hostile work environment.

197.  The harassment was sufficiently severe and pervasive for a period of approximately seven years.

198.  The harassment, as described above, affected Smith physically, mentally, and emotionally.

199.  The harassment permeated her workplace at Whataburger.

200.  Smith suffered adverse employment actions right after he complained about hostility and discrimination

201.  Smith suffered multiple adverse employment actions because she complained. She would not have suffered said adverse employment actions and retaliatory hostile work environment but for her complaints.

202.  Additionally,  Smith  would  not  have  suffered  retaliatory  hostile  work environment but for her engagement in protected activities.

203. As a result of Defendant or its agents' conduct, Smith suffered harm and continues to suffer harm that she would otherwise not have suffered had Defendant taken prompt, immediate remedial action against Ambriz, Lopez, Chowdry, and Castro. Defendant and/or its agents/employees' conduct was a substantial factor in causing Smith's harm.

## COUNT III - RETALIATORY HOSTILE WORK ENVIRONMENT

204. Plaintiff Smith re-alleges and incorporates all applicable paragraphs above into this paragraph.

205. Smith engaged in protected activities when she complained on multiple occasions. Defendant and/or its employees took a materially adverse action against her, and a causal connection exists between the activity and the adverse action. Defendant's and/or its employees action have the effect of unreasonably interfering with the Smith's work.

206. The harassment Smith suffered because of her race was severe or pervasive enough to create an objectively intimidating, hostile, or offensive work environment for her.

207. Smith suffered and continues to suffer ridicule, intimidation and hostility in her work environment because of her race. Defendant's and/or its agents/employees' conduct has inter alia, caused Smith serious emotional and physical injuries; loss of enjoyment, loss of dignity, loss of self-esteem, distress and mental anguish to mention but a few.

**WHEREFORE,** the Plaintiff Smith prays that the court award her:

a)  Injunctive relief enjoining Defendant and its employees from:

b)  Subjecting Smith to a hostile work environment;

c)   Discrimination against Smith;

d)  Calling  Smith a black bitch;

e)  Calling Smith  a stupid black bitch;

f)  Retaliating against Smith;

g)  Altering and/or manipulating Smith's schedule;

h)  Denying Smith's reasonable request to attend church service;

i)   Subjecting Smith to grueling work hours;

j)  Subjecting Smith to continuously work the busiest shifts;

k)  And award Smith compensatory damages for the harm suffered because of the hostile work environment, discrimination, retaliation and retaliatory hostile work environment;

l)  Costs and reasonable attorneys' fees incurred with this lawsuit with interest thereon; and

m)  Other damages including general, equitable and further reliefs as deemed just.

## **JURY DEMAND**

The Plaintiff requests trial by jury.

**NOTICE OF PLAINTIFF'S INTENT TO TAKE DEPOSITION AFTER INITIAL
SCHEDULING CONFERENCE OR AT A TIME ORDERED BY THIS COURT**

Plaintiff intends to initially depose Mohammad Quaini, Samuel Ambriz, Sandra Lopez,
Ana Castro, Shafaq Chowdry and Defendant's corporate designee. Please provide these
witnesses available deposition dates within 60 days of the Initial Scheduling Conference.

Respectfully submitted,

**THE GBENJO LAW GROUP**

By: /s/ *A. Sampson Gbenjo*

A. Sampson Gbenjo
Texas Bar No. 24043047
**E-mail:  yourlawgroup@yahoo.com**
Huey P. Carter, Jr.
Texas Bar No. 03916750
**E-mail: attorneyhpcarter@aol.com**
9009 Bissonnet Street
Houston, TX 77074
Tel. (713) 771-4775
Fax. (713) 771-4784
**ATTORNEYS FOR PLAINTIFF**